BURTON v. TEXAS & P. RY. CO.

(Circuit Court of Appeals, Fifth Circuit. December 31, 1906.)

No. 1,574.

MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE MACHINERY—NEGLIGENCE—QUESTION FOR JURY.

In an action for injuries to plaintiff while in the employ of defendant railroad company, caused by the blowing out of a plug which had been placed in the crown sheet of a locomotive on the inside of the fire box, evidence *held* to require submission of the question of defendant's negligence in inserting the plug, etc., to the jury.

In Error to the Circuit Court of the United States for the Western District of Texas.

Geo. E. Wallace and J. A. L. Wolfe, for plaintiff in error.

Geo. Thompson, W. L. Hall, Peyton F. Edwards, Peyton J. Edwards, and P. R. Price, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This was an action by the plaintiff in error, E. E. Burton, against the defendant in error, the Texas & Pacific Railway Company, to recover damages for personal injuries claimed to have been received by him while in the employ of the defendant in error, and proximately caused by its negligence. The accident was occasioned by the blowing out of one of the plugs which had been placed in the crown sheet on the inside of the fire box of the engine, whereby steam and boiling water was thrown on the plaintiff and inflicted serious injury on him. When the plaintiff had introduced all of his evidence, the defendant moved the court to give to the jury the general charge for the defendant, which the court thereupon did, and there was verdict and judgment in accordance with this instruction. The plaintiff brings this writ of error.

We will notice only the (2) error assigned, which is as follows:

"(2) The court erred in instructing a verdict for the defendant and in refusing to submit the question of negligence to the jury, for the reason of the preponderance of the evidence introduced showed that the plug which blew out of said engine was defective, unsafe, and dangerous, and had been improperly placed and maintained in the crown sheet of said engine, and was known to said defendant, or could have been known by the exercise of ordinary care; that defendant was guilty of negligence in the manner and way in which said plug had been inserted and maintained, and was also guilty of negligence in not inspecting said plug and crown sheet and discovering the unsafe condition of said plug and repairing said crown sheet by inserting a new plug, which said negligence and negligent acts and omissions on the part of defendant was a proximate cause of plaintiff's accident and injury."

The defendant corporation operates a line of railway from El Paso, Tex., to Toyah, Tex. At the time of the accident plaintiff was working as brakeman on what is known as a "dead freight train," which was being pulled by engine No. 257 and was then near a station known as "Malone." The proof shows that this engine (and numerous other engines used by defendant on that part of its line) was originally con-

structed and equipped with brick arches for the protection of flues and other appliances therein; that there were four pipes connecting the crown sheet with the flue sheet, through which pipes steam and water was conveyed; that prior to plaintiff's injury this engine (and others) was remodelled, and these arches and pipes were removed or abandoned and the holes or places where the pipes were originally located were filled up with plugs which were screwed and fastened into the crown sheet for the purpose of closing the openings therein made by the removal of the pipes and in order to retain water and steam in the boiler. The witness Fred Fahrenkamp, who at the time of the injury, and at the time of the trial, was in the employ of the defendant corporation in the capacity of locomotive fireman, and who had charge of the engine No. 257 pulling the dead freight train at the time of the injury, testifies that it was one of the plugs that had been put in one of the holes in the crown sheet above mentioned, that blew out, and when it blew out, the door was thrown open and the steam, water, cinders, and everything else blew out at the door and the plaintiff was badly scalded. At the time the accident happened there were two gauges of water in the boiler, which was a safe quantity to have; that it was one of his important duties to watch the water, keep plenty of water in the boiler, and, at the same time, not to have too much. At the time of the accident there was between eight and nine inches of water over the top of the crown sheet, that he was carrying between 195 and 200 pounds of steam, which was a safe head of steam, these engines being supposed to carry 200 pounds; that they were running at the rate of 8 or 10 miles per hour going uphill.

A. B. Powers, a witness for plaintiff, testified in substance that, in June, 1904, at the time the injury was received, he was working for the defendant railway company as a boiler maker, and that he did some work at that time on engine No. 257; that originally there were four pipes in the fire box of this engine, which, before he commenced to work for the company in 1901, had been taken out, and the holes plugged up with iron plugs by tapping them out, and screwing plugs in instead; that almost all of the engines on that division originally had pipes in them which were cut out and the holes plugged up as above mentioned. There were eight holes—four in the crown sheet, and four in the flues; these plugs had to be renewed all along by cutting new threads on the sheet where the pipes came out and putting in new plugs. We had to tap the sheet here. By tapping, I mean cutting threads through the crown sheet and the flue sheet. After cutting threads in these sheets we used iron plugs with corresponding threads to fill up the holes. When these threads were first cut on there, there were four and a half threads to the sheet. The sheet is three-eighths of an inch in thickness and there are 12 threads to the inch. When the plug was screwed in, there were about 4½ threads on the plug corresponding to the threads on the sheet. When this engine came back after the accident, I do not know that I examined the threads, because I was in a hurry, working at night, and I and my helper just retapped the sheets and screwed a new plug in. Of course the sheet had to have a new thread put in it. I could not tell at that

time how many threads were in the sheet; I did not count them; I never paid much attention to it. It was in bad shape, and had to be repaired, but I could not say how many threads were there. I never saw the plug, but the sheets had been calked. That is all I know. It had been calked several times, I know. All the evidence there would be of this would be a little ring around the sheet to show where it had been pulling against the plug. Every time you calk it, it would be a little thinner, a litle bit thinner—cut out a little more of it next to the plug. This calking thins the sheet out a little every time and makes it a little thinner. Calking it takes a little of it off and this shortens the threads up. We had to cut new threads in this hole because the plug blew out "and this kinder stripped the threads off." I could not tell whether the boiler plates around that hole was thinned from having been calked one time or more. It might have been made by the first calking, or it might have been made by more calkings. The sheet was thinner than the original sheet fom the calking. The calking made it thinner. I do not know whether it was the first, second, or third calking, but I know it had been calked and was thinner than the original sheet when it was first put on. This crown sheet was originally three-eighths of an inch thick. I would say it was about one-eighth of an inch thinner—just by estimating it.

N. C. Mace, a witness introduced by the plaintiff, testified in substance: I am a boilermaker; foreman of the El Paso Foundry & Machinery Company; have had 11 years' experience; am familiar with the construction and repairing of locomotive boilers, having served my apprenticeship in a locomotive engine shop where they repair locomotive boilers. Since this time I have had 11 years' experience. I am foreman of the boiler department of the shop where I work. My work has been general boiler repairer and the construction of new boilers. From my experience I know the manner and way in which holes in boilers should be plugged or stopped up. I am familiar with the construction of crown sheets and flue sheets connected by pipes for the purpose of supporting brick arches, and know how these pipes are fitted in the boilers. The openings made by the removal of these pipes are usually stopped by tapping the holes; and screwing plugs on the inside of the firebox. By tapping, I mean cut threads in the hole to be filled with the plug. This can be done so as to make the boiler reasonably safe. I would say that if the plug is put in in the proper manner, under ordinary circumstances, it is impossible for it to blow out. If the plug is put in in the proper manner, and kept in proper repair, it is impossible for it to blow out. I know what is meant by calking. I understand that term as applied to boiler making. It is proper when the plug is inserted to calk. This is done by taking the peen of the hammer—that is, the reverse side or round end of the hammer—and tapping around the edge of the plug so as to make it lap over onto the sheet. You tap the plug and not the sheet, for the reason that the blow striking that way on the plug has a tendency to expand it, make it tighter, drive the particles of matter together, and the calking of the sheet would have a tendency to the reverse to a certain extent; that is, it would have a tendency to

loosen it up or drive the sheet further from the plug. It would not enlarge the hole very perceptibly, but the jarring of the hammer on the sheet would have a tendency to disturb the mesh of the threads. If, when a new plug is put in one of these original pipe holes, the man who put it in (the boiler maker) should calk the sheet (not the plug, but the sheet) so as to cut off one-third of the sheet—in other words, make it one-third thinner—in my opinion as a boiler maker that plug would not have been properly put in; because he has weakened the sheet by one-third. Ordinarily, crown sheets are three-eighths of an inch thick. This is the common thickness of an average locomotive. If a plug 2 inches in diameter is placed in the crown sheet of an engine carrying 2 (200?) pounds steam pressure, the plug would of course carry 200 pounds to the square inch, and the area of a 2-inch plug is 3.1416, or 3⅛, and a little more than 600 pounds of pressure carried on that plug. If the crown sheet had been calked so as to do away with one-third of it, it would be considered reasonably safe if the calking process had not disturbed the threads, but you could not take away one-third of the sheet without disturbing the threads. So I would say that its efficiency had been lessened by one-third. An engine which is built to carry 200 pounds of steam will be considered safe until the steam pressure has reached seven times the amount carried; in other words, seven is considered the factor of safety in locomotive boilers. It is not considered that a boiler is in danger of eruption until the pressure is seven times what the steam gauge registers. After these pipes are removed and the plug is properly put in, I should not say it would equal the capacity; that is, carry the same pressure that a new sheet would. In my opinion that would be reduced to something like five—the factor. If the plug is properly put in, it would be reasonably safe. I base this statement on my own experience. I have put in numbers of these plugs. During some six years of my time, I have had some experience off and on with this class of engines that had these pipes, and during this time have put in several of these plugs. The more general cause of these plugs blowing out is that they begin leaking; the mud gets in around the meshes of the threads and has a tendency to destroy them, and as they are calked it generally loosens them up and destroys the meshes of the thread. Another reason that may be assigned would be an excessive steam pressure, which is very seldom. It might be that the water had been low on the crown sheet and the sheet become heated to a higher temperature than it would be if the water were on it, and in that case the hole would be expanded and it would allow the meshes of the thread to separate with the pressure. I would say that it was not possible that 195 pounds of steam on an engine that carries the pressure of 200 pounds to blow out one of these plugs, if it was properly put in and in proper repair.

M. H. Gibbs, a witness for the plaintiff, testified in substance, that he had been employed as a boiler inspector by railway companies. Had about nine years' experince working for the Santa Fé, was familiar with the construction of locomotive boilers and the manner in which an inspection of them is made, knows what is understood by

flue sheets and crown sheets, and is familiar with the manner in which holes that were left by the removal of pipes are stopped in these crown and flue sheets.

T. J. Maloney, a witness for the plaintiff, testified that he was a machinist, had had 25 years' experience as such, had worked for the G. H. Railway Company in El Paso as a machinist and afterwards as foreman. His duties required him to look after the repair of locomotives. He had charge of that work. He was familiar with the manner in which openings in the crown sheets and the flue sheets are closed, and knew how to do that work. These witnesses, Gibbs and Maloney, were examined fully, and thoroughly cross-examined, and their testimony was substantially to the same effect as that of the witnesses whose testimony has been recited. As is not unusual in such cases, all of these witnesses for the plaintiff were examined by able counsel with the ingenuity acquired by veteran experience, and some qualification in the shading of the testimony is shown in the narrative of it as given on this acute cross-examination; but the substance of the evidence, we think, is as we have stated it. The rule to determine when the evidence is such as requires that it should be submitted to the jury to find the facts as to the issue joined by the parties is so admirably discussed and clearly stated in the case of the Grand Trunk Railway v. Ives, 144 U. S. on page 417, 12 Sup. Ct. 679, 36 L. Ed. 485, that it has not been departed from or qualified in the many more recent cases, but has been expressly approved, or assumed to be correct in all of them. Some of the language of the opinion to which allusion has just been made is the following:

"There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms "ordinary care," "reasonable prudence" and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case, may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered as one of law for the court."

We deem it unnecessary to cite other authorities. There are reported cases almost without number which have been passed upon by courts of last resort, both state and federal, illustrating the application of the rule above announced. A number of such cases have been before us on writ of error, and our views have heretofore been fully expressed in the reports of the opinions announcing the decisions of this court in such cases. Referring generally to the decisions of the Supreme Court of the United States, with which we assume that the members of the bar are familiar, and to the decisions of this court, with which the members of the bar in this circuit should be familiar,

we conclude that the trial court in the case now before us erred in withdrawing the case from the jury by his instructions to them to return a verdict for the defendant.

Therefore, the judgment of the Circuit Court is reversed, and the case is remanded to that court, with directions to award plaintiff a new trial.